### UNITED STATES of America, Plaintiff,

### v.

### PENICK & FORD, LTD., Incorporated, a Delaware Corporation and R. J. Reynolds Tobacco Co., a New Jersey Corporation, Defendants.

### Civ. A. No. 345–65.

United States District Court
D. New Jersey.
May 21, 1965.

David M. Satz, Jr., U. S. Atty., Newark, N. J., Vincent Commisa, Asst. U. S. Atty., George Miron, Sinclair Gearing, Milton A. Kallis, Dept. of Justice, for the Government.

Lum, Biunno & Tompkins, by William F. Tompkins, Newark, N. J., for Penick & Ford, Ltd.; Breed, Abbott & Morgan, New York City, by Kendall B. DeBevoise, New York City, John J. Campbell, Sea Gert, N. J., Robert W. Kent, New York City, of counsel.

Carpenter, Bennett & Morrissey, by James D. Carpenter, Newark, N. J., for R. J. Reynolds Tobacco Co.; Davis, Polk, Wardell, Sunderland & Kiendl, New York City, by Taggart Whipple, Roland W. Donnem, John J. McAtee, Jr., New York City, of counsel.

COOLAHAN, District Judge.

On April 6th, 1965 at 1:10 P.M., the United States of America filed a complaint against the defendants, Penick & Ford, Ltd., Incorporated (hereinafter referred to as Penick) and R. J. Reynolds Tobacco Company (hereinafter referred to as Reynolds) claiming jurisdiction under 15 U.S.C.A. §§ 4 and 25. In addition to the complaint the Government sought a motion for a temporary restraining order to prevent the defendants from taking any action in furtherance of a purchase agreement whereby Reynolds was to acquire the assets and business of Penick. This acquisition was to be closed on April 6th, 1965 at 2:00 P.M. However, when advised of the fact that the suit had been authorized by the Attorney General the parties voluntarily agreed to defer this closing until the Court could set the matter down for hearing. Therefore, the temporary restraint application became unnecessary and the matter was scheduled for presentation upon the motion for a preliminary injunction before the United States District Court for the District of New Jersey on May 11, 1965.

Prior to the hearing date all parties submitted full and complete briefs outlining their factual contentions and the legal propositions upon which they rested. The bulk of the material to be submitted into evidence was filed with the Court prior to the actual hearing. In addition the Court was provided with a transcript of the proceedings on a daily basis so that the entire record would be considered in reaching a decision.

At the hearing the Government presented six witnesses and many documentary exhibits in support of their motion for a preliminary injunction to restrain the acquisition referred to above. The witnesses were all active executives in the starch business and had first hand knowledge of the industry. The defendant Penick presented affidavits by its officers in opposition to the motion together with certain statistical data (Ex. D.P–F. 1–6) and its president, M. J. Martin, testified at the request of the Court. The defendant Reynolds produced Spencer B. Hanes, its executive vice-president and a member of the Board of Directors, and introduced certain exhibits into evidence reflecting figures on their purchases and financial condition in general (Ex.D.–R.1, 2 & 3). At the close of the testimony and after full oral argument, this Court took the matter under advisement to study all materials submitted.

Penick is a corporation engaged in a business consisting of two main facets, production of corn derivatives (which accounts for 60% of its sales) and grocery products (which accounts for the remaining 40%). It is the corn derivatives portion of the business which is the subject matter of the instant action. More particularly it is the corn wet milling division of this business with which we are immediately concerned herein (apparently 30% of the entire business—Tr. Pg. 255). This industry is composed of ten firms engaged in the production from raw corn and sorghum grain of starch, dextrin, corn syrup and other by-products by a process known as wet milling. Penick is approximately fourth in size among the ten producers which compose the industry. In addition there are two large nonproducers who purchase starch from the producers (at a price less than that available to consumer purchasers) and who resell the same in competition with the industry. Penick's share of the overall market from its fourth position is approximately 12.8% (Tr. Pg. 279, which figure apparently excludes starch sold by Grain Processing Company and would therefore be a smaller percentage of the market). In addition to this makeup of the competitive market there exists an importa-

tion of tapioca from outside the United States which accounts for approximately 10% of the total starch purchased in the market for use in the paper industry (Tr. Pg. 276).

The largest single use of starch produced by this corn wet milling process is found in the corrugated box and paper industry. It is utilized as an adhesive substance in the manufacture of those products. It is competition in the sale of starch and dextrin to these paper companies and the reciprocal trading practices found in this relationship which the Government contends will be grossly impaired should Reynolds acquire control of Penick.

The witnesses produced by the Government and the bulk of the documents introduced into evidence tend to establish that the starch producers and the paper company consumers engage in the practice of trade relations which fosters reciprocity. Reciprocity is basically the policy of favoring one's customers in purchasing commodities sold by them. When further refined this policy blossoms into a practice where a company's sales may be allocated directly to the amount of purchases made by them from its customers, and may develop into relationships whereby seller A is urged to purchase from concern C which is in turn a customer of A's direct purchaser B. See 78 Harv.L.Rev. 1386 (1965). This latter process has been termed as secondary reciprocity.

The evidence indicated that the sale of starch and dextrin to the paper industry was highly competitive in the sense that there were many producers each having a fair share of the total available market. Testimony was offered that the market conditions were favorable and that an expansion was in the offing. The sales organizations and the research teams of the various competitors were considered prime factors in each company's ability to compete and maintain itself in this highly competitive market. However, all witnesses freely admitted that reciprocity was a definite industry factor and that on certain occasions business had been lost or obtained in this manner. The witnesses testified that although they did not favor this practice they were compelled to follow same by necessity. It is apparently a well grounded practice in this area and has been for several years, although in recent years it has been abating. It is interesting to note, however, that although reciprocity plays an important role in industry competition, there is great emphasis on research and sales techniques since the competitive makeup of the industry requires these factors be given prime consideration regardless of any reciprocal overtones mentioned previously.

The Government produced Mr. Robert G. Rohwer who is the sales manager of the wet milling division for Grain Processing Corporation. He testified that his company entered the corn starch industry late in 1960. Since that time the firm has enjoyed tremendous success apparently due to the application of a new process exclusively developed by them which greatly reduced the price at which the product could be offered for sale. In their relatively short period of competition in the industry, this company vaulted to the number two spot in share of the market purely on a basis of price and quality competition. Although Mr. Rohwer testified that reciprocity prejudiced some of his company's efforts, it is readily apparent that while present in the industry, it is not so significant a factor as to preclude competition where other competitive means are not equivalent.

Defendant Reynolds offered testimony as to its generally proscribed business approach to the problem of reciprocity. It was flatly and unequivocally stated that reciprocity plays no part at all in Reynolds' present business including its acquired corporations. There is no inter-relationship between its purchases and sales and the Government failed to prove or allege any deviation from this policy. Furthermore, Mr. Hanes testified that Penick would be an autonomously managed concern and would not have available materials from Reynolds which

would enable utilization of data for reciprocity purposes. No proof was adduced by the Government to show that Reynolds had deviated from this policy in the conduct of its tobacco business or in the management of the corporations acquired by its efforts to diversify. Consequently, the record discloses Reynolds position to be that reciprocity on behalf of Penick would be abandoned as a sales policy and that competition along the lines of intensified research and increased efficiency in quality and suitability for needs would be the competitive factors upon which Penick would operate. Reynolds would supply the necessary capital to finance these proposed marketing, development and production improvements and facilities.

Reynolds offered evidence as to the amount and breakdown of its purchases. Testimony established that Reynolds does not compete with Penick in any business activity nor does it buy from or sell to Penick. They do purchase an amount of corn starch in the $30,000. annual range from which they make adhesive to glue cigarette paper and apparently a quantity of corn syrup. Although Reynolds purchases encompass a great dollar volume in paper containers, bags, cardboard boxes and other containers there has been no policy of reciprocity practiced either currently or in the past. The purchasing and sales departments are unrelated and under the control of different executives. The cigarette paper utilized (in which no starch is used) can only be obtained from two companies with which Reynolds divides its purchases. The material used for cigarette cartons is currently only obtained from West Virginia Pulp and Paper Company since that firm has developed a light weight board which is not as yet available from other producers. However, Reynolds is attempting to encourage others to duplicate this process so that their sources of supply will be increased since it is their business policy to deal with as many suppliers as possible to insure lowest price and a readily available source.

The above analysis of Reynolds purchasing and sales policy was offered as evidence of the effect on Penick's business position by the acquisition of that firm by Reynolds. It is their established policy not to engage in reciprocal arrangements. Reynolds has for years been successfully competing in an industry which features aggressive non-price competition. In order to successfully compete in such a market Reynolds must keep costs at a minimum if they are to maintain industry wide prices and still produce a favorable ratio of earnings to sales dollar. They are the leading cigarette sellers in many areas and attribute their favorable profit position to constant cost control. Such cost control dictates a policy of purchases on the basis of price, quality and suitability for needs rather than because of reciprocity. Furthermore, Reynolds gross business is far greater than Penick's and it would seem poor economic judgment to jeopardize such successful business policy in order to increase the sales of a newly acquired subsidiary, especially where the increase will only be in a small percentage of that subsidiary's entire gross business.

It is the contention of the Government that the acquisition by Reynolds of Penick would violate Section 7 of the Clayton Act (15 U.S.C.A. § 18). Although this is a merger which may be classified as conglomerate rather than a vertical or a horizontal acquisition, the Government contends that other anticompetitive factors will come in to play if Reynolds is allowed to enter this field. It is urged that the presence in the industry of reciprocal trade policies and the degree to which they currently abound therein gives rise to the inference that should a major source of purchasing power be inserted into the existing structure, competition would be greatly injured as a result of the increased reciprocal power which could be generated by a corporation of great financial magnitude. The legal support for this proposition rests on the recent case of F. T. C. v. Consolidated Foods Corp., 85 S.Ct.

1220, 14 L.Ed.2d 95 (1965). That case annunciated the underlying theory of the Government's position in the instant litigation. The Court stated that:

> "We hold at the outset that the 'reciprocity' made possible by such an acquisition is one of the congeries of anticompetitive practices at which the antitrust laws are aimed, if the probable consequence of the acquisition is to obtain leverage in one field or another." (At page 122).

Consequently, if the Government can sustain its burden of proof upon this motion, ample authority exists for the granting of the relief sought.

■■ Upon a motion for preliminary injunction in a matter such as the instant litigation (where the United States is the plaintiff) the movant must establish that the merger in question would violate the provisions of Section 7 of the Clayton Act. The violation of Section 7 which must be proven is described as an acquisition which "may have the effect of substantially lessening competition." It is not incumbent upon the Government to demonstrate the precise way in which violations of law might result in injury to the public interest. It is sufficient to show that the threatened act was within the declared prohibition of Congress. United States v. Ingersoll-Rand Company, 320 F.2d 509, 524 (3rd Cir. 1963). Consequently, the Government must prove by clear and convincing evidence that the transaction sought to be prohibited will have a probable substantial anticompetitive effect. In addition to this probability of the lessening of competition there must be presented a reasonable probability of success in proving their case on the merits upon final hearing. United States v. Chrysler Corp., 232 F.Supp. 651 (D.N.J.1964) and United States v. Aluminium Ltd., 1965 Trade Cases § 71, 366 (D.N.J.1965).

■■ As was stated in United States v. Ingersoll-Rand Company, supra, 320 F.2d, at page 523 " * * * the issuance of an interlocutory injunction rests within the sound discretion of the trial court." In appraising this merger the Court must, therefore, determine in its discretion whether it is likely that the acquisition sought would substantially lessen competition and whether a subsequent divestiture would or would not adequately protect the public interest. Section 7 is illustrative of the Congressional intent to prohibit transactions with a probable anticompetitive effect and to prevent these acquisitions in their incipiency. Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

It is fundamental that the plaintiff must show that the proposed acquisition will result in a situation falling within the declared prohibition of Congress. The Government's theory as to the violation which will be made possible by the instant acquisition is increased reciprocity. It has been held that this concept is violative of the Clayton Act. "Reciprocity in trading as a result of an acquisition violates § 7, if the probability of a lessening of competition is shown." F.T.C. v. Consolidated Foods Corp., supra, 85 S.Ct. at page 1222.

In presenting its case to the Court the Government clearly established the lines of commerce upon which it was concentrating. This Court is sufficiently convinced that the corn wet milling industry is a line of commerce in and of itself. The sale of corn starch to the paper industry is the particular sub-line of commerce which the Government argues will be effected by this acquisition. The Government's proofs in regard to the establishment of the lines of commerce and the geographical market area (the entire country) seem to be uncontroverted and to appropriately establish these questions in accordance with the existing authority. See Brown Shoe Co., supra and United States v. Aluminum Co. of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964).

The remaining crucial factor to be considered is the establishment of the reasonable probability that the merger will have a substantial anticompetitive effect upon the industry structure. The Gov-

ernment's theory in this case is posited upon the Consolidated Foods case, supra. While that decision lends support for the underlying theory many factual distinctions exist between the two cases. Furthermore it appears that these distinctions are so integrally related to the legal determinations which follow that the matters become quite dissimilar.

The facts of the Consolidated Foods case evidence the entrance by acquisition into an oligopolistic industry by a large concern having generally related customers. The market was made up of four firms, two of which controlled a 90% segment. In that case, Consolidated acquired Gentry which held a 32% share of the entire market. After the acquisition Consolidated undertook to assist Gentry in selling. The F.T.C. filed a complaint charging violation of Section 7 on reciprocity grounds since in the agency's opinion, the acquisition gave Gentry the advantage of a mixed threat and lure of reciprocal buying in its competition for business and the power to foreclose competition from a substantial share of the markets for dehydrated onions and garlic. Also present in that case was a ten year history of post-acquisition activity to guide the Court in its determination. While this post-acquisition evidence is not conclusive nor can it override all probabilities, it is obviously of great probative aid in determining the question. Furthermore, the finding by the F.T.C. that the association of Gentry with Consolidated would give the former an unfair advantage over competitors was a determination supported by the record and made by an agency whose expertise the Congress trusts. F. T. C. v. Consolidated Foods Corp., supra, 85 S.Ct. at page 1225.

In contrasting these facts with the instant litigation many points of divergence are readily apparent. The industry structure under consideration is far different than the oligopolistic market found in Consolidated. The corn wet milling industry has ten viable, aggressive competitors none of which clearly dominates the entire market as Gentry and Basic did in Consolidated. Furthermore, the history of the industry as presented by the proofs evidence the entry into the competitive market by a new company (Grain Processing) which through the use of more efficient production means was able to effectively engage in price competition and swiftly move to the head of the industry in the short space of 3½ years. While reciprocity or trade relations was present in the industry, it was an insufficient factor to stifle the meteoric rise of this company.

This was a far different state of facts than were present in Consolidated's entrance into the market. In that case, while a new entry had occurred in one instance, it met with little success in capturing any appreciable segment of the available business. The two smaller members of the dehydrated onion market operated only at sufferance of the giants. Here quite the contrary is present. Competition flourishes among the producers and indeed among certain non-producers who are able to compete on a resale basis because of advantageous buying connections and speciality processes.

The Government has attempted to show that entrance into the market by Standard Brands and the acquisition of Best Foods by Corn Products evidenced mergers which gave rise to reciprocity and curtailed industry competition. However, while testimony indicates that certain companies lost sales during these periods, individual and industry growth are present to negative or minimize the inferences flowing from the alleged effects of these prior mergers. The industry remained highly competitive throughout.

The Government, through documentary evidence (Ex.P. 1–306) and live testimony, has established that reciprocity is currently present and pervasive to a degree in the corn wet milling industry. Since it is conceded that Reynolds is a giant corporation, it follows that the purchasing power of Penick would increase tremendously. They reason that the reciprocal policy of Penick would then be strengthened to such a marked degree

that industry wide competition would be substantially lessened.

The Court is entreated to accept this reasoning merely on the basis of the inference that Reynolds would naturally engage in this reciprocal policy by virtue of its acquisition of Penick. As a matter of fact, Reynolds introduced testimony that reciprocal buying played no part at all in its organization. Furthermore, company policy was to increase business through competitive means by providing financial support to obtain production and technological advantages, both proper competitive weapons. At no time did the Government show or introduce proof that Reynolds had ever deviated from this non-reciprocal policy either in its own business or in the business of the concerns acquired by it under its diversification program. No proof was adduced to show other than the mere possibility that Penick's acquisition would have substantial impact upon competition.

Mr. Justice Stewart, concurring in Consolidated Foods, supra, states that "Clearly the opportunity for reciprocity is not alone enough to invalidate a merger under § 7. The Clayton Act was not passed to outlaw diversification." (Concurring Opinion 85 S.Ct. page 1227). He continues, "The touchstone of § 7 is the probability that competition will be lessened. * * * But the record should be clear and convincing that the requisite probability is present." (Page 1228). He further states, "Without post-acquisition evidence, the trier is faced with a blank slate and untested speculation."

■ At best the Government has proven that reciprocity is currently present in the industry. From that they seek the inference that entrance into the market by Reynolds would greatly increase this reciprocity and hence materially lessen competition. However, Reynolds is not in the position of functioning in a closely allied field of commerce as was Consolidated. Reynolds' motives for acquisition are manifestly aimed at diversification rather than efforts to obtain leverage in the starch industry. Their contact with the paper producing firms is by no means on a reciprocal basis, nor is there any showing that there would be deviation of a serious nature from past policies a result of this acquisition. Again referring to Consolidated, we find that officials of the acquiring corporation sought to assist Gentry in selling and introduced principles of reciprocity into the sale program by supplying lists of their suppliers. While an acquiring corporation is not entitled to a "free trial" period, neither is the "mere possibility" of increased reciprocity enough for the Court to grant the desired relief.

■ The Government is not completely remediless since the threat of divestiture is present if the post-acquisition conduct and/or the trial of the case establishes the violation of Section 7 as claimed. The proofs of this case are only inferential and are not of the nature sufficient to disclose probable violations of the Act *in-limine*. The inferences are all based on the assumption that Reynolds' presence in the market would alone increase the reciprocity to so marked a degree that competition would be impaired and that it is impossible to otherwise compete by normal competitive means. These inferences are dissipated by the evidence given by Reynolds and by the competitive nature of the industry as emphasized by the increasing sales of all the firms and the marked rise of Grain Processing in a relatively short span. The entry into the market by Standard Brands, Best Foods and Anheuser-Busch has apparently not resulted in substantial impairment of the competitive makeup of the industry. Although reciprocity was allegedly increased by virtue of these acquisitions, there is no evidence in the record that they have been attacked by the F.T.C. or that great changes have been wrought in industry policy. Clearly these firms were more closely allied to the starch industry than a comparatively unrelated purchaser such as Reynolds.

As a matter of fact the tenor of the testimony is that industry prospects are optimistic, the size of the available market increasing and that many firms are

contemplating substantial investments in plant and production facilities. In addition emphasis is on the development of various specialty products. The Reynolds witness mentioned the artificial sweetening process as an area of proposed concentration by Penick after acquisition by virtue of the new source of capital then available. Reciprocity is considerably downgraded in this field of operations.

In short we find that the evil here exists prior to the acquisition sought to be restrained. The injection of Reynolds into the market (as with any large company) presents the possibility of increasing this evil by increasing purchasing power. However, possibility is not probability and in light of the testimony the Court is impressed that the existing evil will be diminished rather than increased by the Reynolds acquisition because of their business policies and available capital.

In the face of the entire record presented, this Court cannot say that it is convinced that the Government's hypothesis is anything more than mere speculation inferred from a state of facts ambiguously conducive to such conjecture. The facts exist but the probability of the contention has not been established. The United States has not proven the probability of lessening of competition and the showing of a reasonable probability of success on final hearing in order for the injunctive relief to be granted. The Court is not convinced that the proposed merger "may probably lessen competition." There has not been a sufficient showing that the acquisition will create the probability of a protected market in the industry which cannot be penetrated by competing firms, and more particularly that Reynolds would engage in or encourage the type of practice prohibited. Consequently, the Government's motion for a preliminary injunction must be denied.

Let counsel for the defendants submit an appropriate order with consent of the Government as to form. Defendants are directed not to consummate the transaction for a minimum period of five days from the date of the filing of this opinion.