**UNITED STATES of America,
Plaintiff,**

v.

**R. J. REYNOLDS TOBACCO CO.,
Defendant.**

**Civ. A. No. 345-65.**

United States District Court
D. New Jersey,
Civil Division.
June 3, 1966.

Vincent Commisa, Asst. U. S. Atty., Newark, N. J., Samuel Karp, Sinclair Gearing, Robert Kaplan, Department of Justice, Washington, D. C., for plaintiffs.

James D. Carpenter, Carpenter, Bennett & Morrissey, Newark, N. J., Davis, Polk, Wardell, Sunderland & Kiendle, New York City, by Taggart Whipple, Roland W. Donnem, James W. B. Benkard, New York City, of counsel, for defendants.

## OPINION

COOLAHAN, District Judge.

I. This action was brought by the United States under the Anti-trust Laws to challenge the merger of R. J. Reynolds Tobacco Co. [Reynolds], and Penick & Ford, Ltd., Inc. [Penick]. The amended complaint alleges the combination is an unlawful restraint upon commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; and also that Reynolds' acquisition of Penick's assets violates Section 7 of the Clayton Act, 15 U.S.C. § 18, in that it may substantially lessen competition in the sale of starch to paper and packaging materials manufacturers throughout the United States. The Government seeks divestiture.[1]

On November 8, 1965 plaintiff moved under Rule 34, F.R.Civ.P. for the production and inspection of certain documents. Thereafter, having learned that numerous documents from Penick relevant to the reciprocity practices discussed below, were gathered in the office of defendant's counsel, the Government filed a supplemental motion under Rule 34 on February 7, 1966 requesting those documents.[2]

Defendant Reynolds objects to both motions for production on several related grounds.

First, Reynolds claims the Government has failed to show "good cause" since the information sought is either irrelevant, or unnecessary for a determination of the remaining issues, or already within the Government's possession or knowledge. Specifically, Reynolds contends that:

1) Copies of some requested documents already have been supplied to the Justice Department,

2) Many requests cover a period dealt with by prior investigations of the starch industry,

3) Many requests are not relevant to the sole issue which Reynolds maintain is before the Court,

4) Since the hearing on the preliminary injunction was practically a full trial on the merits, little further litigation, and hence little further discovery, is necessary.

Second, Reynolds claims that the categories of documents requested are not spelled out with sufficient particularity.

Third, Reynolds urges that any possible value which the documents might have at this juncture would be far outweighed by the unreasonably burdensome

---

1. The Government's request for a preliminary injunction prior to the merger was denied by this Court after extensive briefs, exhibits and oral testimony by both parties. United States v. Penick & Ford, Ltd., Inc. and R. J. Reynolds Tobacco, 242 F.Supp. 518 (D.N.J., May 21, 1965). [Hereafter United States v. Penick].

2. Rule 34 in part provides: "Upon motion of any party showing *good cause* therefor * * * the court in which an action is pending may (1) order any party to produce and permit the inspection * * * of any designated documents, papers, books, accounts, letters * * * not privileged, which constitute or contain evidence *relating* to any of the matters within the scope of the examination permitted by Rule 23(b) and which are in his possession, custody, or control * * *."

Rule 26(b) allows examination "regarding any matter, not privileged, which is *relevant to the subject matter involved in* the pending action, whether it relates to the *claim or defense* * * * of any * * * party * * *." [Emphasis added.]

task of determining what is demanded and collecting it.

In reply, the Government claims that this Court's opinion denying preliminary relief indicated further evidence was needed to carry plaintiff's burden of proof. It maintains that the requested documents are directed to that evidence, are adequately described, and are not unduly burdensome in view of their importance to a full and fair trial of the issues.

The Court has considered each disputed request in light of the particular nature of this case and the present posture of its litigation. On that basis, the Court is of the opinion that the plaintiff's motions for production should be granted with certain prescribed limitations hereinafter discussed.

II. The difficulties peculiar to Antitrust discovery have been detailed fully elsewhere.[3] It suffices to note that in regard to questions of relevancy, necessity, and reasonableness, ample support can be found in the "leading cases" for either a permissive or a restrictive approach to such discovery. Indeed some decisions contain equally eloquent statements both of the proponent's right to full disclosure and of his opponent's right to refuse unreasonable demands and harassment.

■ In actions involving the structure and dynamics of large industries, almost every facet of their business may be relevant in some way. The issues subject to proof are complex and wide-ranging; in short, protracted litigation is inherently burdensome on both sides. Nevertheless, a line must be drawn. Discovery must be kept in bounds by weighing the burdens of production against the importance of the information sought. In the final analysis, this is what the numerous cited decisions really teach.

III. In the present matter, the issues have been more fully explored and sharp-ly defined than usual by virtue of the hearing on preliminary relief.

Reynolds correctly states the ultimate issue before the Court.

"[W]hether the acquisition of Penick by Reynolds will aggravate reciprocity in sales of starch by Penick to the paper trade sufficient to create the probability of a substantial lessening of competition." Defendant's Brief, pg. 2.

Penick's two main areas of endeavor are starch and related derivatives and grocery products. Reynolds, a leader in all facets of the tobacco industry, also has diversified into food products [Hawaiian Division] and packaging [Archer]. In denying preliminary relief, the Court stated that "[t]he sale of corn starch to the paper industry is the particular sub-line of commerce which the Government argues will be effected by this acquisition." United States v. Penick, 242 F.Supp. at 523. Moreover, the Court found that reciprocity—the use of buying power to secure sales—pervaded the trade relations of starch producers and paper packaging manufacturers. Id. at 523.

From this, Reynolds concludes that the practices of Penick's non-starch divisions are irrelevant to the issue of impaired competition in starch sales to the paper companies. It further contends that since Reynolds was not in the starch business at all before the merger, its own activities are *a fortiori* irrelevant to this issue.

The Court always welcomes efforts to contain the litigation within manageable proportions. However, Reynolds confuses the ultimate legal issue with the scope of relevant discovery. The subline of commerce in which competition will allegedly suffer is one thing; the range of activities outside that subline which may affect competition within it—or which indicate it will be affected—is another matter.

3. See this Court's Opinion in United States v. Aluminum, 268 F.Supp. 758 (D.N.J., Jan. 5, 1966); United States v. Continental Can Co., 22 F.R.D. 235 (S.D.N.Y. 1958).

## PENICK

■ Reynolds continually refers to the "corn-starch-paper axis", but Penick's use of reciprocity to sell starch was not limited to the buying power of its starch division; a significant role was played by the paper packaging purchases of its food and grocery divisions both directly and through secondary reciprocity involving intermediary transactions.[4] The business practices of Penick's non-starch divisions clearly tended to reduce competition in the sale of starch to paper companies. They might do so in the future. Records of their past and present purchasing policies are therefore relevant.

Since the nature and extent of Penick's reciprocity practices has been explored at length at the hearing for preliminary relief, the Court sees less need for discovery in this area than in regard to Reynolds. But this is not to say that the Government, upon reconsideration of its case, is precluded from presenting a fuller analysis of the potential power which Reynolds acquired if such can be obtained without undue burden. See Note 7, infra.

## REYNOLDS

As for Reynolds, its trade practices before and after the merger are relevant in two distinct ways: As an indication of Reynolds' general policy on reciprocity, and *as a measure* of Reynolds' potential leverage on starch sales.

In essence, this Court denied a preliminary injunction because it believed Reynolds' claim that it had never used reciprocity nor intended to use it in the future.[5]

■■ The Government's theory, then as now, was that Reynolds' great buying power will aggravate the use of reciprocity to obtain starch business for Penick. In addition to showing the existence of reciprocity in the starch industry and the opportunity to increase it created by the merger, the Government must also show a likelihood that Reynolds will utilize the opportunity. A Section 7 complaint requires a reasonable probability that competition will be substantially lessened; the Government showed only the mere possibility. United States v. Penick, at 523. [And cases cited].

Admitting this initial failure of proof, the Government is unwilling to accept Reynolds' disavowal and maintains its right to disprove it through adequate discovery of Reynolds' records.[6] Obviously Reynolds past records will not aid the Government if they in fact did avoid reciprocity. But the Court's denial of preliminary relief was not a final adjudication of the issue. That opinion made clear that litigation was not necessarily complete despite the extensive hearing.[7]

■ Section 7 actions inherently require prognosis, so post-acquisition behavior is significant—though not as

4. United States v. Penick, 242 F.Supp. at 521. For example, there was evidence Penick's grocery division bought bottles on condition they be shipped in containers made by Penick's starch customers. Hence the cases cited by Reynolds which refused discovery for "product lines * * * as to which no violation is alleged," are inapposite. Defendant's Brief, pg. 7.

5. Reynolds offered uncontradicted cogent testimony that its company policy, applied to all divisions, rejected reciprocal arrangements; that it sought Penick for reasons unrelated to reciprocity; and that neither its old divisions nor Penick would indulge in trade relations following the merger. Reynolds has since submitted af-

fidavits outlining a comprehensive anti-reciprocity program which Penick has undertaken at its request.

6. At oral argument, the Government delicately suggested that witnesses for Reynolds "might have been stating all [they] knew", and added "If they have none [reciprocity documents] then they have none, of course. But we are asking for them." [Tr. 7].

7. "The Government is not completely remediless since the threat of divestiture is present if the post-acquisition conduct *and/or the trial of the case* establishes the violation of Section 7 as claimed." United States v. Penick, at 525 [Emphasis added].

much as defendant urges in the present case.[8] But Reynolds' past policy and practice also indicate its likely course of action, and by virtue of Reynolds' defensive assertions they are still at issue.

■ Moreover, the past practices of Reynolds' divisions are relevant in this regard even for units which cannot exert significant pressure on starch buyers. To borrow defendant's metaphor, examining Reynolds' purchase and sales correlation is less a matter of unearthing "ancient archeology" than of learning the mores of the natives.

Reynolds' records are relevant in a second way. To the extent its divisions and subsidiaries can exert substantial purchasing pressure on starch customers, Penick's reciprocity power is increased.[9] If the reciprocity potential of these divisions has been considered in regard to starch, this bears on Reynolds motives for the merger;[10] and if any steps have been taken to implement such opportunities since the merger, the records would be doubly relevant.

IV. However, to reject Reynolds' definition of which matters are still relevant, is not to accept the Government's view that it is entitled to every single document embraced by the sweeping language of its November 8th Motion. [The Supplemental Motion of February 7th is a special case discussed below].

■ Necessity, as well as relevance, is an element of "good cause" under Rule 34. United States v. Continental Can, supra, 22 F.R.D. at 236.

The Government insists it seeks only "reciprocity documents": documents demonstrative either of Penick's and Reynolds' reciprocity policies and practices or of their plans to utilize it after the merger. But the actual requests, in terms, are not so limited.

The Government's characterization is predicated on the assumption that Reynolds explored and/or practiced reciprocity. What the Government really is saying, is this: *If* Reynolds did practice reciprocity or explore its possibilities—especially concerning Penick—before the merger, *then* all the requested documents are precisely the kind which probably would be used to implement such programs, or evaluations, or planning.

Reynolds' objection is predicated on the contrary premise, namely, its denial of reciprocity. [With the exception of Penick's pre-merger activities].

A huge marketing organization like Reynolds has voluminous nationwide files of marketing studies, sales analyses, purchasing analyses, customer lists, supplier lists, and related data. It deals with many multi-product companies. Its records, therefore, may mention or collectively list customers who happen to be suppliers—of the same or a different division—and companies who are potentially both suppliers and customers,[11] *even though they were not prepared or used for reciprocity purposes.*

---

8. The defendant urges the Court to focus on the post-merger activity; the Court has noted the improbability of violation until the immediate threat of litigation was lifted. See Note 7, supra. Cf. Justice Douglas' comment that "[n]o group acquiring a company with reciprocal buying opportunities is entitled to a 'free trial' period." FTC v. Consolidated Foods Corp., 380 U.S. 592, 598, 85 S.Ct. 1220, 1224, 14 L.Ed.2d 95 (1964). Whatever relevance this caution may have had in the *Consolidated* case itself, where the merger was already 10 years old, it certainly applies here, where the merger occurred during this very litigation.

9. In this connection, the Government is particularly interested in the Archer division which manufactures foil, and other packaging products. It deals extensively with the paper packaging industry.

10. At the preliminary hearing, the Court concluded *from the evidence then before it* that Reynolds motive was diversification and research possibilities rather than obtaining leverage in the starch industry. United States v. Penick, at 525.

11. The permutations of the second class include customers who are potential suppliers; the converse; and companies not dealing with the Reynolds group who are both potential customers and potential suppliers.

The Court is well aware that reciprocity programs are frequently concealed, and that documents designed for such use are not always conveniently labeled.

██ Nevertheless, Rule 34 does not contemplate a roving commission to examine materials which might be relevant as "reciprocity documents" if such a scheme existed, in the absence of any showing thus far that it did exist. The Government cannot, in other words, sift all Reynolds marketing or purchasing data and correspondence in hopes of finding reciprocity opportunities which, through permissible inference, might support its hypothesis.

██ V. Therefore, the Court has tried, within practical limits, to confine the specific requests to: 1) those documents which on their face deal with reciprocity practices or with its potential utility; and 2) those documents which were in fact designed to facilitate such practice or evaluation. This does not appear to be the time or place for the Government to begin a preliminary investigation of the tobacco industry, or Reynolds' other various enterprises.

For the above reasons, the Court's disposition of the individual requests for production under Rule 34 is as follows:

## MOTION OF NOVEMBER 8, 1965

██ This Motion requests nine items, of which items Nos. 3, 4 and 5 have already been produced pursuant to stipulation. Paragraph 1 seeks:

"All correspondence, notes, memoranda, minutes of meetings, recommendations, surveys, analysis, studies and reports referring or relating to:

"(a) The acquisition or proposed acquisition by Reynolds of Penick;"

"(b) Plans, programs, proposals or considerations concerning the operation and development of Penick after acquisition by Reynolds;"

"(c) Any actual, potential or anticipated effect of Reynolds' acquisition of Penick or of the resulting combination;"

Reynolds has already produced the "formal" studies and reports requested for these three items. The remainder of 1(a) is denied. Any informal materials regarding the acquisition or proposed acquisition which would be sufficiently relevant to the issues of reciprocity and motives for the merger are adequately covered by requests 1(b) and 1(c). As for item 1(b), informal notes and other documents *which refer to or analyze the use of reciprocity in the post-acquisition operation and development of Penick* shall be produced. Obviously many of Reynolds' plans for Penick after the merger and many of the anticipated effects are not relevant herein.

██ The required production of informal materials for item 1(c) is similarly restricted to those documents *which refer to or analyze the effect, potential effect or anticipated effect of the merger or resulting combination upon the sale of starch through reciprocity.*

"(d) Penick's marketing position or marketing or sales practices;"

"(e) Archer's marketing position or marketing or sales practices;"

Informal and formal documents covered by requests (d) and (e) shall be produced *if they refer to or were designed for the use of reciprocal trade relations or for an evaluation of its use.*

"(f) The actual or potential market position of any producer of starch which is used by paper or packaging manufacturers or processors;"

"(g) Competitive conditions or marketing practices in (i) the corn wet milling industry, or any other industry producing starch used by paper or packaging manufacturers or processors, or (ii) the paper or packaging manufacturers or processing industries;"

"(h) Effects, or potential or anticipated effects in the starch producing or paper packaging manu-

facturing or processing industries, of Standard Brands, Inc.'s acquisition of the Corn Products division of Clinton Foods, Inc. or of the resulting combination."

"(i) Effects, or potential effects or anticipated effects, in the starch producing or paper packaging manufacturing or processing industries, of the merger of Corn Products Refining Co. and Best Foods, Inc. or of the resulting combination."

Formal studies and reports for items (f) through (i) have been made available. Informal documents under 1(f) and 1(g) need not be produced; the general state of competition in the paper and starch industries has been amply covered by materials already presented to the Court. Informal documents under 1(h) and 1(i) shall be produced *only if they refer to or analyze the impact of reciprocity practices or potential practices of those merged companies upon Penick's sale of starch.*

 Paragraph 2 seeks:

"All studies, reports, surveys, analyses and memoranda, prepared or received since June 1, 1964 referring or relating to:

"(a) The improvement of sales position or profitability of Penick or Archer;"

"(b) Changes or innovations in sales policies or practices involving products sold by Penick or Archer;"

Documents under 2(a) relating to *Penick's sales position or profitability in the sale of starch* shall be produced in full. Documents under 2(a) relating to Penick's non-starch division or to Archer shall be produced *only if they refer to or analyze improvement achieved through the use of reciprocity.* All documents under 2(b) *referring to Archer or any Penick division shall* be produced *if they refer to or analyze changes or innova-*

*tions involving the use of reciprocity or its discontinuance.*

Paragraph 6 seeks:

"All lists of

"(a) concerns to which either Penick or Archer has made sales and from which Reynolds has made purchases;"

"(b) concerns, selling products used by Reynolds, to which either Archer or Penick has made sales and from which Reynolds has made no purchase;"

"(c) concerns, buying products sold by either Penick or Archer, to which either Penick or Archer has not made sales and from which Reynolds has made purchases;"

"(d) concerns, buying products sold by either Penick or Archer and selling products used by Reynolds, to which neither Penick nor Archer has made sales and from which Reynolds has made no purchase;"

Such lists shall be produced *if they either (1) indicate on their face both the purchasing (or potential purchasing) and the selling (or potential selling) relationship of the concerns with* some part of the Reynolds-Penick complex; or (2) if they were *designed to facilitate reciprocity or an evaluation of its possible use.* If such lists are obvious *purchase and sales comparisons or were otherwise prepared for reciprocity purposes,* then their identification and collection should not place an unreasonable burden on the regional or divisional staffs of the corporation.

"(e) customers or potential customers of Archer, requested by, sent to, used or considered by, or intended to be sent to, used or considered by, any other subsidiary or division of Reynolds;"

"(f) the suppliers or potential suppliers of Reynolds other than Archer's suppliers, requested by, sent to, used or considered by, or

intended to be sent to, used or considered by Archer;"

"(g) customers or potential customers of Penick, requested by, sent to, used or considered by, or intended to be sent to, used or considered by, any other subsidiary or division of Reynolds;"

"(h) the suppliers or potential suppliers of Reynolds, other than Penick's suppliers, requested by, sent to, used. or considered by, or intended to be sent to, used or considered by, Penick;"

The lists called for in items 6(e) through (h) shall be produced *only if they were prepared, or requested, or used or considered for the purpose of increasing Archer's or Penick's sales through the use of reciprocity, or the purpose of exploring the possibility of such increases.*

"(i) concerns which buy from and sell to Reynolds; and all minutes of meetings, correspondence, notes, memoranda and reports referring or relating to any such lists, the preparation or promulgation thereof, or proposals, directions or instructions that any such lists be prepared or promulgated."

Such lists, and documents relating to such lists, shall be produced subject to the same limitation imposed upon the requests in items 6(a) through (d), supra.

 Paragraph 7 seeks:

"All minutes of meetings, correspondence, memoranda notes or reports, containing, referring or relating to:

"(a) any inquiry, suggestion, recommendation or discussion by any officer, employee or director of Reynolds as to the possibility, desirability, necessity or effect of

(i) selling to and buying from the same concern;

(ii) selling to a concern from which Reynolds buys; or buying from a concern to which Reynolds sells

(whether or not the document specifically states that Reynolds buys from or sells to the concern named);

(iii) purchasing from or increasing purchases from Reynolds' suppliers or potential suppliers which are also purchasers or potential purchasers of products sold by Reynolds;

(iv) selling to or increasing sales to Reynolds suppliers or potential suppliers;

(v) purchasing from concerns known to buy supplies from other concerns to which Reynolds sells; `

(vi) selling to concerns known to sell to other concerns from which Reynolds makes purchases;"

Documents under Item (a) (i) shall be produced; they are strong evidence of an interest in reciprocity. Items (a) (ii) through (a) (vi) present a problem of ambiguity: The Government contends these requests obviously refer to discussions, recommendations, etc., addressed to reciprocity practice or possibilities; Reynolds reads them to include discussions, recommendations, etc., which refer to sales policy or purchasing policy alone and not to their reciprocal combination (even though the firms under consideration are or might be both purchasers and suppliers of Reynolds).

The Court finds this a problem easily circumvented. Any documents covered by the language . of Items (a) (ii) through (a) (vi) which would be sufficiently indicative of Reynolds use of or policy towards reciprocity will also be covered by Item (d) of this paragraph. Therefore, with the exception of (a) (i), the requests under 7(a) are denied.

 "(b) Any request suggestion, recommendation, direction or instruction by any officer employee or director of Reynolds that Reynolds purchase from or sell to any concern or category of concerns referred to above in subparagraph (a) (i) through (a) (vi);"

The request of Item (b) is denied; adequate production in this regard is provided by Item (d) of this Paragraph.

"(c) Any arrangement for, or policy or practice of, selling to and buying from any concern or category of concerns referred to above in subparagraph (a) (i) through (a) (vi);"

This request is also denied; adequate production in this regard is provided under Items (d) and (e) of this paragraph.

"(d) Any analysis, discussion or mention of, or directions, instructions, suggestions, or recommendations concerning any practice of reciprocity, trade relations or the use of factors other than price, quality, service or advertising in making or obtaining sales of goods produced by Reynolds, or in making purchases of supplies used by Reynolds;"

All documents under (d) shall be produced *only if they concern any practice of reciprocity or trade relations*: The use of factors other than price, quality, service or advertising in sales or purchase policy may involve interesting Anti-trust considerations, but unless those factors concern reciprocity they are not now before this Court.

"(e) Directions, instructions, suggestions, discussions, or recommendations concerning

(i) the establishment of any program, position or office in Reynolds to organize or conduct any practices concerning reciprocity or trade relations;

(ii) the assignment of personnel to consider or organize or conduct any practice concerning reciprocity or trade relations;"

Any documents under Item (e) shall be produced.

Paragraph 8 seeks:

"All correspondence, memoranda, notes or reports, referring or relating to meetings, interviews or other contacts, by or between

"(a) Any official or employee of Penick or Archer and any officer or employee of any concern which sells products of a type purchased by Reynolds, concerning sales of products by Penick or Archer;"

"(b) Any officer or employee of Reynolds and any officer or employee of any concern which purchases products of a type sold by Penick or Archer, concerning sales to Reynolds;"

"(c) Any officer or employee of Reynolds and any officer or employee of any concern which purchases products from, and sells products to, Reynolds, concerning the sale or purchase of products!"

For the reasons discussed hereinabove in regard to Paragraphs 6 and 7, the requests of Paragraph 8 are too broad. The documents requested in this Paragraph shall be produced *only if they concern the use of reciprocity in the sale and/or purchase of* the products therein described.

Paragraph 9 seeks:

"All communications, concerning the sale or purchase of products, passing between

"(a) Reynolds and any customer or potential customer of Penick or of Archer and which refer to purchases by Reynolds;"

"(b) Reynolds and any supplier or potential supplier of Reynolds and which refer to the availability of products sold by either Penick or Archer;"

"(c) Reynolds and any supplier or potential supplier of Reynolds and which refer to purchasing from either Penick or Archer; and all correspondence, memoranda, notes or reports referring or relating thereto;"

Documents requested in this Paragraph shall be produced *only if such correspondence was used or intended for use in facilitating reciprocity.*

With the aforesaid limitations on producton required under the November, 1965 Motion, Reynolds' other objections to that Motion either are obviated or lack sufficient merit to outweigh the importance of the requested information to the litigation.

Some of these limitations employ phrases which themselves are open to interpretation such as "designed for reciprocity", "to facilitate reciprocity", or "to explore the use of reciprocity." In the final analysis, this phraseology is unavoidable if the Pandora's box of unreasonable production is to be kept shut. The Court has full confidence in defense counsel's and Reynolds' understanding of the term reciprocity, the nature of reciprocity practices, and the procedures which they entail, even if Reynolds has not utilized them. In short, if the documents whose production the Court directs do exist, Reynolds will know which ones they are and where to find them.

VI. The Government's Supplemental *Motion of February 7, 1966* requests the production of:

"all documents of R. J. Reynolds Tobacco Company (including its subsidiaries), of Penick & Ford, Ltd., Incorporated, or of both, relating to reciprocity (including purchase and sale analyses, date processing cards and tab runs, correspondence, work papers, memoranda and other papers designed for or capable of facilitating reciprocity) which since June 9, 1965 have been placed in the custody of Davis Polk Wardell Sunderland and Kiendl, attorneys for defendant."

 As heretofore explained, documents *actually designed for reciprocity* purposes are subject to production whatever the burdens. Documents which might facilitate reciprocity, but which were not designed nor used for that purpose, while relevant, would not be subject to production if an unreasonably burdensome search and identification was required.

 However, since this supplemental Motion refers to documents conveniently gathered in the office of defense counsel, such burdens are not involved; widely scattered, voluminous records need not be searched. In fact, insofar as Penick is concerned, the request merely mirrors the language used in correspondence between the Board chairman of Reynolds, Mr. Bowman Gray, and the President of Penick, Mr. Marion Martin, which outlined an anti-reciprocity program for Penick to follow.[12]

Since the documents were collected because they at least related to reciprocity—if not having been designed for it as well—and since they are now collocated, they shall all be produced for the Government's inspection. Even if they have been produced in regard to earlier investigations, or if the Government has garnered essentially the same information through prior discovery in this suit, it will involve little further difficulty for counsel to let the Government examine these records once more.

The Motion also refers to any similar documents of Reynolds which may have been collected in defense counsel's office. He maintains there are none. (Tr. 17). If any such records should be found in those collected at counsel's office, of course, they also must be produced.

One final point remains. Some of the Penick documents which are requested in specific paragraphs of the original Motion (and which this Court has directed shall be produced) may be included in the collection of papers referred to in this Supplemental Motion. Since the Government will have an opportunity to inspect the papers collected in defense

---

12. Letter of June 9, 1965. Item 7 of this program states that "[A]ll records in existence designed for the practice of reciprocity or *which might facilitate* its practice should be removed from the files promptly and sent to our counsel. * * *" [Emphasis added.]

counsel's office, it will not be incumbent upon Reynolds to sift through those documents and reproduce them individually as well. Only documents referred to in the original Motion which *are not contained* in the collection sent to counsel's office need be produced individually in satisfaction of the specific requests of the November Motion which the Court has granted.

Let an appropriate Order be submitted.